UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

Sean J. Floyd                )
                             )
                             )
    **Plaintiff**            )
                             )   No.
                             )
                             )
v.                           )
                             )
WALDO COUNTY, et al.,        )
                             )
    **Defendants**           )

## COMPLAINT

### Jury Demand

1. This action seeks money damages because of four Waldo County deputy sheriff's participation in wrongful deprivation of Plaintiff's rights. Plaintiff alleges that all of the Defendants acted under color of state law and variously violated Plaintiff's rights under the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

### Jurisdiction

2. This Court has jurisdiction over Plaintiff's federal claim under 42 U.S.C. § 1983.

### Parties

3. Plaintiff Sean Floyd is an individual who resides at 33 Walters Road, Swanville, Maine.

4. Defendant Waldo County is the local governmental unit for which Defendants Nick Oettinger, Darrin Moody, Daniel Perez and Jordan Tozier worked at all times relevant hereto.

5. Defendant Nick Oettinger is a deputy sheriff employed by Waldo County, Maine. At all times relevant hereto he acted under color of state law. He is sued in his individual capacity.

6. Defendant Darrin Moody is a deputy sheriff employed by Waldo County, Maine. At all times relevant hereto he acted under color of state law. He is sued in his individual capacity.

7. Defendant Daniel Perez is a deputy sheriff employed by Waldo County, Maine. At all times relevant hereto he acted under color of state law. He is sued in his individual capacity.

8. Defendant Jordan Tozier is a deputy sheriff employed by Waldo County, Maine. At all times relevant hereto he acted under color of state law. He is sued in his individual capacity.

**Facts**

9. Swan Lake Grocery (SLG) is a store located in the downtown area of Swanville, Waldo County, Maine.

10. At the times relevant hereto, SLG was owned by Robert and Debora Newcomb, and their son, Alex Newcomb, and grandson, Gage Newcomb were employed there.

11. On or about August 8, 2018, Plaintiff was given a No Trespass Notice for picketing in SLG's private parking lot by Waldo County sheriff's deputies, and was asked to leave SLG's private property.

12. Plaintiff told deputies he would relocate his protests to public property nearby, but defendant Oettinger informed the plaintiff that he was being given a 'warning' and he needed to wait for 24 hours before resuming his protests on public property anywhere near the store.

13. As a direct result of defendant Oettinger's unlawful 'warning', Plaintiff did not feel safe from unreasonable seizure while on public property.

14. On or about August 11, on public property in downtown Swanville, Plaintiff was approached by Alex and Gage Newcomb. While Alex Newcomb stood by, Gage Newcomb began verbally accosting, insulting, taunting and provoking the plaintiff. When ignored, Gage Newcomb threatened to take Plaintiff's sign and "shove it up [his] ass!" and then escalated his taunts and provocations at one point shouting that he would "kill" the Plaintiff.

15. SLG called in a complaint against the plaintiff to the sheriff's office. A sheriff's department unit arrived promptly and defendant Moody approached and began to question the plaintiff. Plaintiff responded that he was the one who had been harassed and threatened.

16. Defendant Moody then went and spoke to Gage Newcomb. After a few moments, Gage shouted over to Plaintiff, "I admitted it. Don't worry."

17. This was witnessed by a small crowd of people in the parking lot.

18. On or about August 11, on public property in downtown Swanville, Alex Newcomb and an unidentified woman approached Plaintiff and proceeded to verbally accost, insult, taunt and attempt to provoke him. They then called the sheriff's department and lodged a complaint against the Plaintiff.

19. A sheriff's department unit arrived promptly, and defendant Daniel Perez served the plaintiff with a summons for criminally trespassing on SLG's property.

20. Plaintiff had not trespassed, and the charges were eventually dropped.

21. Defendant Perez also informed the plaintiff that, in addition to being a summons for criminal trespass, the summons also constituted a 'warning' not to 'cause a disturbance' for the next 24 hours or Plaintiff would be would be subject to arrest.

22. Defendant Perez declined to take Plaintiff's complaint about the harassment and provocation of the plaintiff by Alex Newcomb and the unidentified woman.

23. As a direct result of defendant Perez's actions, due both to the defendant's failure to address the plaintiff's complaint, as well as to the defendant's unlawful threat to arrest the plaintiff if his actions 'cause a disturbance' again within 24 hours, Plaintiff no longer felt safe being on public property.

24. On or about August 12, 2018, Plaintiff was on public property in the downtown area of Swanville, occasionally addressing passerby at a conversational volume. Defendant Moody arrived and informed the plaintiff that he was responding to a call from SLG alleging that Plaintiff was 'causing a disturbance' by accosting customers.

25. Plaintiff informed defendant Moody that was not accosting customers and in fact that the call was demonstrably false. Defendant Moody said he "didn't care"; he was "getting tired" of the calls from the store, and then he berated the plaintiff for a while for wasting the sheriff department's time because they "have more important things to deal with than [the plaintiff's] 'beef' with the store."

26. After Plaintiff demanded that he do so several times, defendant Moody finally stopped berating the plaintiff and listened to him assert his Constitutional rights for a moment. Moody then responded by saying, "If I have to come down here again, I'm going to arrest you regardless." and left.

27. As a direct result of defendant Moody's actions, Plaintiff no longer felt safe from unlawful arrest while on public property.

28. On or about August 12, 2018, Plaintiff called the sheriff's department to complain about defendant Moody's actions, and ended up being transferred to defendant Moody himself.

29. Plaintiff tried to lodge a general complaint about the way the people from the store were abusing the legal system to harass the plaintiff and interfere with Plaintiff's Constitutional rights by attempting to provoke the plaintiff and then calling in false complaints against the plaintiff, and doing so repeatedly.

30. Plaintiff described the relevant incidents on August 11 involving Alex and Gage Newcomb - and the defendant himself - as well as the roughly homologous incident involving Alex Newcomb and an unidentified woman later that same day.

31. Defendant Moody blamed the plaintiff for causing the the situation: He told the plaintiff, "Well, you are causing a disturbance, too." When Plaintiff asked how, the defendant stated, "Ultimately you are causing this by protesting there." When Plaintiff objected to this, and asserted that he had a Constitutional right to protest, defendant Moody agreed, but then reasserted, "Ultimately you are causing the disturbance by going down and protesting there." Plaintiff then asked how he could possibly be held accountable for causing a disturbance if he was acting within his rights. The defendant said, "Well, there wouldn't be any disturbances down there if you weren't doing that."

32. Defendant Moody eventually told Plaintiff, "Like I told you before, you can go up there and you can have a sign, that's fine. But if you do, and you speak to - or engage in anything with - customers, I will be up to arrest you."

33. In response to this threat, Plaintiff said that he was not going to go back at that time anyway, especially given defendant Perez's (false) trespassing summons and warning from the previous day. Plaintiff then asked the defendant, "I have 24 hours, right?" Moody replied, "What's that; For the disorderly conduct?" When the plaintiff replied in the affirmative, Moody said, "Yep, and when I talked to you again today, that counts as another warning."

34. As a direct result of defendant Moody's actions, Plaintiff no longer felt safe from unlawful arrest while on public property, and was blatantly denied equal protection of the laws.

35. Plaintiff recorded this phone conversation (although some parts are difficult to discern).

36. On or about August 13, while Plaintiff was on public property in downtown Swanville, Gage Newcomb and a half dozen or so other young males arrived and formed a loose semi-circle around Plaintiff about a dozen feet away. Newcomb began verbally taunting and harassing the plaintiff. Plaintiff remained silent because of defendant Perez and Moody's 'warnings'.

37. After a few minutes of harassment, Newcomb began to threaten the Plaintiff with physical violence, saying, "I'm gonna come over there and break every bone in your body! And I'm a former state champion wrestler so I can do it, too!"

38. Plaintiff remained silent, and after a few moments the group dispersed. Newcomb then got into his pickup truck and repeatedly drove past Plaintiff, revving his engine and spewing exhaust fumes, giving Plaintiff the middle-finger, and shouting insults. A few times he pulled to a stop and sat glaring at Plaintiff. After about 20 to 30 minutes of this behavior, he drove away squealing his tires and did not return.

39. This was witnessed by a variety of individuals in the area at various times, and likely at least partly captured by the store's surveillance cameras.

40. Plaintiff felt unsafe remaining on public property. He returned home and called the sheriff's department and was connected to defendant Perez. Plaintiff reported the incidents that had occurred earlier that day involving Gage Newcomb. Perez told the plaintiff, "We won't be

able to get any charges to come out of it since you weren't afraid enough at that exact moment." Plaintiff pointed out that this was the second time Newcomb had threatened the plaintiff with violence, and that Plaintiff was afraid Newcomb might have or obtain a weapon and use it against the plaintiff in future, but defendant Perez declined to pursue the matter further.

41. As a direct result of defendant Perez's actions, Plaintiff no longer felt on public property and was blatantly denied the equal protection of the laws.

42. On or about August 14, unbeknownst to the plaintiff at the time, defendant deputy Jordan Tozier held a meeting with the owners of Swan Lake Grocery, Robert Newcomb and Debora Newcomb, their attorney, Roger Hurley, the store's head managers Kelly Ward and Nancy Larrabee, and at least one employee - and Plaintiff's former workplace harasser - Roberta Kimaball. These individuals collectively viewed some or all of a video Plaintiff had posted a few days prior on YouTube, and then the Newcombs and their employees all wrote and submitted complaints against the Plaintiff for 'Terrorizing'.

43. On or about August 14, at 1:24 pm, on public property near Swan Lake Grocery, Plaintiff was arrested for 'Terrorizing' by defendants Tozier and Moody.

44. During the arrest, Tozier asked Plaintiff if he had said he wanted to kill Rob Newcomb. Plaintiff had never said that he wanted to kill Rob Newcomb, but had used violent imagery when discussing his feelings about Newcomb and SLG in a YouTube video (while simultaneously clearly communicating that he had no intention of doing anything illegal or violent). But in the heat of the moment Plaintiff replied, "Yes, but I also said I wasn't going to actually do it." Defendant Tozier replied, "That doesn't matter because you used 'actual names' in your video."

45. During post-arrest interrogation at the sheriff's office in Belfast, Tozier read the Terrorizing statute to the plaintiff. Plaintiff pointed out again that he had not threatened anybody with violence. Tozier responded; "Even if you didn't threaten anybody, we can still get a conviction."

46. As a direct result of defendant Tozier's actions, Plaintiff was deprived of the due process of law and subjected to an unreasonable seizure by being arrested without actual probable cause.

47. Plaintiff then said that he wanted to submit a complaint of terrorizing against Gage Newcomb because Newcomb had in fact threatened the plaintiff with violence on multiple occasions, and in clear violation of the statute Tozier had just read. Defendant Tozier, immediately responded, "You can't. You already told deputy Perez that you weren't afraid of him." This directly contradicted the statute he had just read, as well as the plaintiff's actual statements to defendant Perez, however, so Plaintiff persisted. Defendant Tozier, however,

just ignored the plaintiff, turned his back, began filling out paperwork and flatly refused to respond to Plaintiffs repeated requests.

48. Defendant Moody also declined to take Plaintiff's complaint.

49. As a direct result of defendant Moody and Tozier's actions, Plaintiff was deprived of the equal protection of the laws.

50. At Plaintiff's bail hearing a few days later, in response to an inquiry about the high bail amount, the state's attorney for Waldo County referred to a false statement by an unidentified claimant that the plaintiff had been seen "waving a handgun and harassing and threatening customers in the parking lot to the store." Plaintiff was unable to discover the origin of this false statement, and there were no legal consequences for whoever submitted it.

51. As conditions of his release on bail, Plaintiff was required to wear a location-tracking ankle monitor, was banned from public property in the downtown area of Swanville, and was not permitted to 'utilize social media' in any way, thereby effectively limiting Plaintiff's ability to exercise his freedom of speech to in-person protests on his own private property.

52. On August 23, one of Plaintiff's alleged victims, Deb Newcomb, was driving by plaintiff's residence and apparently noticed that plaintiff was there protesting against SLG. Newcomb stopped in the middle of the road (such that traffic had to drive around her), got out her phone and appeared to film plaintiff for a few moments, then drove away.

53. Shortly after, defendant Oettinger and another deputy arrived at Plaintiff's house and threatened to arrest the plaintiff because Deb Newcomb had called to complain about plaintiff protesting too close to the store. They informed plaintiff of her call, and also claimed that plaintiff's ankle monitor had indicated that plaintiff had been in the exclusion zone around the store. Plaintiff pointed out that he had gone nowhere near the 500 foot exclusion zone ordered by the judge, and had been on his own private property, regardless, and was not arrested at that time.

54. As a direct result of defendant Oettinger actions, Plaintiff no longer felt safe protesting on his own property.

55. On or about August 26, Deb Newcomb came back to Plaintiff's residence again. This time, Newcomb pulled over to the opposite side of the road (the side Plaintiff was on), rolled down her window, got out her phone, began filming the plaintiff, and started trying to engage the plaintiff in conversation by saying things like: 'Hey, Sean, can we talk about this? We can work this out. Hey, listen! Let's talk…' Plaintiff did not engage Newcomb, but instead started voicing slogans such as 'Swan Lake Grocery sells UnSafe Food!' while looking away from her. After a few minutes, Newcomb drove away.

56. Shortly afterward, Plaintiff called WCSD and spoke to Deputy Moody about Deb Newcomb's actions. Deputy Moody first ascertained whether or not Plaintiff had interacted

with Newcomb in any way, and reminded Plaintiff that, due to his bail conditions, Plaintiff would be arrested if interacted with Newcomb in any way.

57. Plaintiff requested a Cease Harassment Notice be issued to Deb Newcomb. Deputy Moody flatly denied this request.

58. As a direct result of defendant Moody's actions, Plaintiff was deprived of the equal protection of the laws and no longer felt safe protesting on his own property.

59. On or about August 27, Plaintiff was at his residence clearing brush along Swan Lake Avenue. Plaintiff heard someone shouting from a passing vehicle, and a plastic soda bottle half full of blue liquid went flying past the plaintiff about a foot or two away. The speed limit along that stretch of road is 45 mph, and the bottle was thrown from a vehicle moving with the flow of traffic, so it was moving much more rapidly than if it had been thrown from a standing start.

60. Plaintiff reported this incident to WCSD and noted that there was no immediate need to respond because he hadn't seen which vehicle the bottle had been thrown from since it had passed by along with a few other vehicles, but just wanted the incident on record as it had been potentially lethal.

61. On or around August 29, Plaintiff was protesting at his residence when a hard, heavy, medium-sized squash (a bit larger than a softball) was thrown at Plaintiff from a passing vehicle. Plaintiff was again unable to positively identity the vehicle or driver, but again reported this incident to WCSD for the record.

62. On the afternoon on August 30, Plaintiff was at his residence clearing brush along Swan Lake Avenue when SLG's landscaper drove by in his red pickup and threw something at the plaintiff which sounded like a glass bottle when it landed in the brush nearby. There was a bit of litter in the brush and Plaintiff was unable to identify exactly what had been thrown, however.

63. Shortly after, Plaintiff called WCSD and spoke to defendant Perez. Plaintiff explained the situation, noted the past incidents, and said that he could positively identify the person who had thrown whatever had been thrown that day as Swan Lake Grocery's landscaper.

64. Defendant Perez told the plaintiff that he was very busy that afternoon, but he would try to get a chance to get out to the store later that afternoon; maybe in a few hours.

65. Plaintiff never heard back regarding the incident, but called back a short time later in order to let WCSD know that Plaintiff had left the bottle that had been thrown at him in place where it had landed, and had covered it with a weighted down plastic bag in case it had any fingerprints on it. Deputy Perez was unavailable, but the dispatcher informed the plaintiff that she would pass along the message.

66. On August 31, Plaintiff was at his residence along Swan Lake Ave and SLG's landscaper came by in his red truck again. He pulled across the road - over to the side which the plaintiff was on - slowed down almost to a stop, threw some food in a paper wrapper at Plaintiff, shouted something unintelligible, and then drove away laughing.

67. As a direct result of defendant Perez's actions, Plaintiff was deprived of the equal protection of the laws and no longer felt safe protesting on his own property and consequently completely ceased his protests, thus also being denied his freedom of speech.

68. In October of 2018, Plaintiff submitted several official written complaints to the Waldo County Sheriff's Office as per county policy regarding the incidents described above. These were not addressed for several years. When Plaintiff called to follow up in 2021, a complaint regarding defendant Moody's actions on August 12 was finally addressed and determined to be consistent with Waldo County policy, and then plaintiff was threatened with arrest by the sheriff's department if he continued to try to follow up on the complaints.

69. Plaintiff was indicted and tried for felony terrorizing. At presiding judge Murrey's intervention, Plaintiff was offered a misdemeanor plea deal which was granted. During sentencing, Plaintiff's statement included the assertion that his words had not been illegal. Judge Murrey replied, "Your words may not have been illegal, but they were deplorable!" He then also explicitly noted that Plaintiff had the option of filing a civil suit.

70. As a proximate result of Defendants' actions, Plaintiff has suffered extreme embarrassment, shame, anxiety, undue and excessive financial hardship, devastating damage to his reputation, and mental distress including a preliminary diagnosis of PTSD, as well as a complete undermining of his ability to trust law enforcement.

**Claim**

*42 U.S.C. § 1983--Against All Defendants*

71. Plaintiff incorporates the preceding paragraphs by reference as if fully rewritten herein.

72. Defendants at all times relevant to this action were acting under color of state law.

73. Defendants Nick Oettinger, Darrin Moody and Daniel Perez unlawfully deprived Plaintiff of his freedom of speech and peaceable assembly in violation of the First Amendment to the Constitution of the United States as incorporated and applied to the states by way of the Fourteenth Amendment to the Constitution of the United States.

74. Defendants Darrin Moody and Jordan Tozier made an unreasonable and warrantless seizure of Plaintiff in violation of the Fourth Amendment to the Constitution of the United States as incorporated and applied to the states by way of the Fourteenth Amendment to the

Constitution of the United States as incorporated and applied to the states by way of the Fourteenth Amendment to the Constitution of the United States.

75. Defendant Jordan Tozier unlawfully deprived Plaintiff of liberty and property without due process of law in violation of the Fifth Amendment to the Constitution of the United States as incorporated and applied to the states by way of the Fourteenth Amendment to the Constitution of the United States.

76. Defendants Darrin Moody, Daniel Perez and Jordan Tozier unlawfully deprived Plaintiff of the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States.

77. At all times relevant hereto, Defendants acted pursuant to a policy or custom of Waldo County of assisting officers in depriving individuals of rights without court order and without providing a meaningful opportunity for redress.

78. Defendant Waldo County failed to adopt clear policies and failed to properly train its deputies as in civil rights.

79. Defendant Waldo County's policy or custom, and its failure to adopt clear policies and failure to properly train its deputies, were a direct and proximate cause of the constitutional deprivation suffered by Plaintiff.

80. At all times relevant hereto, these Defendants acted with malice, recklessness and total and deliberate disregard for the rights of Plaintiff.

**Prayer for Relief**

WHEREFORE, Plaintiff prays for the following relief:

A. On all claims, a judgment for compensatory damages in the amounts indicated below ($985,000 total) or as determined at trial, against all Defendants;

(1) Lost Wages/Reduced Earning Capacity: $450,000 total = $150,000 + $300,000 = ($30,000 x [past 5 years]) + ($30,000 x [next 10 years]). I have been effectively blacklisted and been unable to secure even menial employment in Waldo County as a direct and proximal cause of the actions of the defendants.

(2) Pain and Suffering, including Emotional Distress: $300,000. I suffered significant emotional distress resulting from the actions of the defendants; from the lack of equal protection against violent acts and perpetrators, the repeated threats of unwarranted/unlawful arrest, and the social stigmatization/damage to my reputation. In connection; I was recently preliminarily diagnosed with PTSD, in significant part as a direct and proximal cause of the actions of the defendants.

(3) Constitutional Injury: $50,000  For loss of free speech/assembly and liberty, decreased trust in legal system, and increased risk of harm.

(4) Punitive Damages: Nick Oettinger; $5,000. Darrin Moody; $30,000. Daniel Perez; $50,000. Jordan Tozier; $100,000.

B. A jury trial on all appropriate issues;

C. An award of costs and expenses against the Defendants;

D. An injunction that Waldo County be required to train it's deputies more effectively regarding civil rights, and be required to develop reasonable policies for redress of rights abuses by deputies;

E. Any and all other relief this Court may deem appropriate.

Respectfully submitted, Sean J. Floyd

_Sean J. Floyd_, 7/12/2024